

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-16-00517-CV

**IN THE INTEREST OF A.S.**, a Child

From the 166th Judicial District Court, Bexar County, Texas
Trial Court No. 2014-PA-02496
Honorable Richard Price, Judge Presiding

Opinion by:    Sandee Bryan Marion, Chief Justice

Sitting:    Sandee Bryan Marion, Chief Justice
Marialyn Barnard, Justice
Luz Elena D. Chapa, Justice

Delivered and Filed:  December 7, 2016

AFFIRMED

S.E.M. appeals the trial court's order terminating her parental rights to A.S.  S.E.M. asserts two issues on appeal challenging the sufficiency of the evidence to support the trial court's findings that: (1) S.E.M. engaged in conduct that would support termination pursuant to sections 161.001(b)(1)(D) and 161.001(b)(1)(E) of the Texas Family Code; and (2) termination was in A.S.'s best interest.  We affirm the trial court's order.

### BACKGROUND

The Texas Department of Family and Protective Services filed its petition in the underlying cause on October 22, 2014.  A.S.'s date of birth is November 28, 2012; therefore, he was almost

two years old when the Department filed its petition and A.S. was removed from S.E.M.'s care. A.S. was almost three and one-half years old when trial commenced on March 23, 2016.[1]

S.E.M. was the first witness called to testify at trial. S.E.M. stated the Department opened its case because A.S. fell down four outside stairs in August of 2014 while in the care of Joel Llamas. A photograph of A.S.'s injuries was admitted into evidence. The photograph shows bruising to a significant portion of the right side of A.S.'s face. S.E.M. stated she did not take A.S. to the hospital because she was afraid the Department would get involved. S.E.M. did not believe Llamas had injured A.S. or pushed him down the stairs.

S.E.M. admitted her relationship with Llamas was violent. In August of 2014, S.E.M. went to the hospital after Llamas threw a bottle at her stomach while she was pregnant with their child which caused bleeding and cramping. In July of 2015, after S.E.M. refused to allow Llamas to take their son X.L., Llamas head-butted S.E.M. and threw her down three stairs, causing her to have two black eyes. S.E.M. called the police and filed charges. S.E.M. admitted she told the Department a stranger had jumped her because she was afraid the Department would remove X.L.

After this assault, S.E.M. moved to Corpus Christi and remained there until December of 2015. S.E.M. testified Llamas showed up in Corpus Christi, but she denied Llamas also was living at the same Salvation Army shelter where she was living. On the date trial commenced, Llamas was incarcerated in Bexar County. S.E.M. admitted she took X.L. to visit Llamas in jail. S.E.M. testified she did not want any relationship with Llamas.

S.E.M. admitted she had a prior case in 2008 involving two of her other children, A.B., who was fifteen at the time of trial, and N.S., who was nine. A.B. and N.S. were then living in South Carolina. Although S.E.M. initially denied that A.B. and N.S. were removed from her, she

---

[1] The trial began on March 23, 2016 and continued March 24, March 28-31, April 1, April 4, and May 25, 2016.

later testified the children were removed because she violated her federal probation and was sent to jail. S.E.M. stated she would be able to have custody of A.B. and N.S. whenever she went to the courthouse and showed she had a stable home and a stable job. S.E.M. stated she has chosen not to go to court to provide that evidence because A.B. and N.S. were in stable homes and doing well in school. S.E.M. last saw A.B. and N.S. three years before trial commenced, but she speaks with N.S. every few weeks.

With regard to the underlying proceeding involving A.S., S.E.M. admitted she received a service plan from the Department in December of 2014, but she denied anyone at the Department reviewed the plan with her. S.E.M. stated she read the service plan and understood what she needed to complete. S.E.M. agreed she had not completed everything on her service plan. S.E.M completed a psychological evaluation and a 14-week parenting class. With regard to a support system, S.E.M. stated she had the counselors and staff members at the homeless shelter where she was living, and her sister who lived outside of Houston. Although she was required to maintain bi-monthly contact with her caseworker, S.E.M. stated she only kept in contact with the caseworker when she had visits with A.S. S.E.M. was registered to begin domestic violence classes and had restarted counseling in February of 2016. S.E.M. admitted she had already missed one of her counseling appointments.

S.E.M. admitted she did not attend all of her scheduled visits with A.S. A.S. was placed with Llamas's mother from October of 2014 through June of 2015. During that period of time, S.E.M. stated she saw A.S. almost every other day. In June of 2015, A.S. was moved to a foster home where he still was residing when trial commenced. S.E.M. was scheduled to visit with A.S. twice a week after he was moved to the foster home. After S.E.M. moved to Corpus Christi, she was scheduled to visit A.S. twice a month. S.E.M. was unsure how many times she visited with A.S. while she lived in Corpus Christi. After S.E.M. returned to San Antonio, her visitation

schedule was again changed to twice a week. S.E.M. testified she was unsure how many of the visits she made. S.E.M. admitted that she missed out on bonding time with A.S. when she missed her visits. S.E.M. testified A.S. cries when their visits are over, and A.S. loves his brother X.L. S.E.M. further testified A.S. wants to live with her and X.L. S.E.M. testified A.S. had a black eye while living in the foster home, and she was told he fell running up the stairs. S.E.M. also observed bruises on A.S.'s back and was told A.S. and his foster brother sometimes hit each other. S.E.M. further testified that A.S. had lice and pink eye while in the Department's care.

S.E.M. admitted she did not have stable housing. When the Department removed A.S. in October of 2014, S.E.M. was staying with a friend. She stayed with that friend for two months before moving to the courtyard of a homeless shelter. S.E.M. lived in the courtyard until March of 2015 when she moved into her own apartment. X.L. was born on May 29, 2015, and Llamas visited her apartment a few times before and after X.L.'s birth. S.E.M. was kicked out the apartment in July of 2015 because Llamas made threats against her neighbors and the police were called. When S.E.M. moved to Corpus Christi, she initially lived with a friend for three weeks before moving to a Salvation Army shelter where she had her own room. S.E.M. testified she returned to San Antonio in December of 2015 because the caseworker informed her it was difficult for A.S. to travel to Corpus Christi for their visits. Upon returning, she stayed at a hotel for a few weeks before moving to the homeless shelter where she was given a room in the family dorm because X.L. was with her. S.E.M. was still living at the homeless shelter when trial commenced. S.E.M. testified A.S. would have his own bed in her room at the homeless shelter, and she has clothes and toys for A.S. in the room. S.E.M. testified she can stay at the shelter until she is approved for other housing.

With regard to employment, S.E.M. started working in December of 2014 and changed employers in April of 2015 where she worked until the middle of May. S.E.M. was next employed

when she moved to Corpus Christi in July of 2015. S.E.M. has not been employed since she returned to San Antonio in December of 2015 because she does not have daycare for X.L. S.E.M. had submitted the paperwork necessary to obtain daycare at the homeless shelter a week before trial and was informed it would take a couple of weeks before X.L. could be provided daycare. S.E.M. explained she had not been able to submit the paperwork earlier because she needed X.L.'s shot records and a referral from her case manager. On March 29, 2016, the fourth day of trial, S.E.M. testified she found a job working at Sea World, but she was not sure of her start date.

With regard to the goals of her service plan, S.E.M. testified she cannot demonstrate the willingness and ability to protect A.S. from harm because the Department had not given her a chance. S.E.M. stated she would only be able to demonstrate such a willingness and ability if A.S. was returned to her custody. Although S.E.M. agreed staying away from Llamas as the alleged perpetrator of A.S.'s abuse would show a willingness to protect him, S.E.M. testified she visited Llamas in jail. S.E.M. testified she had demonstrated the ability to make good choices in partners by remaining single; however, S.E.M. admitted she had been involved in another relationship while she was living in Corpus Christi. Although S.E.M. had taken medication for her mental health issues which included depression and bipolar disorder in Corpus Christi, she had been unable to schedule an appointment to obtain refills since returning to San Antonio; however, she was working to schedule an appointment. With regard to the goal of keeping A.S. safe, S.E.M. admitted she dated Larry Bela just before A.S. turned one. After S.E.M. was told Bela was a registered sex offender, S.E.M. took A.S. to the hospital to be checked but denied telling anyone Bela had been inappropriate with A.S. S.E.M. denied being in a cycle of violence. S.E.M. denied A.S.'s father was violent with her and denied reporting he was abusive and threatened to kill her and A.S. S.E.M. agreed that demonstrating proper parenting of X.L. would show the court her parenting skills. When a caseworker drove S.E.M. to another town for an appointment, S.E.M.

admitted she did not change X.L.'s diaper or reapply any cream during the four hours she was with the caseworker even though she told the caseworker X.L. had diaper rash. S.E.M. explained she checked X.L.'s diaper several times, but he did not need to be changed.

A victim advocate employed by the district attorney's office was assigned the case against Llamas for his assault against S.E.M. S.E.M. contacted the victim advocate on March 11, 2016, stating she wanted to drop the charges because Llamas and S.E.M. had gotten back together. When questioned whether she was certain S.E.M. made the phone call, the victim advocate explained S.E.M. correctly spelled her name even though it was a hard name to spell, and she also provided additional verifying information. S.E.M. testified she never called the victim advocate.

Dr. Ann Marie Hernandez, a psychologist, conducted a psychological evaluation on S.E.M. on April 21, 2015, and her report was admitted into evidence. Dr. Hernandez testified S.E.M. told her Bela had been sexually inappropriate with A.S. S.E.M. also told Dr. Hernandez Kent Burgess was abusive to her and A.S., and Juan, A.S.'s father, was abusive and threatened to kill her and A.S. S.E.M. did not mention Llamas being abusive and stated she believed A.S. had fallen down the stairs. Dr. Hernandez expressed concern that S.E.M. was minimizing Llamas's role in A.S.'s injuries. Based on S.E.M.'s prior relationships, Dr. Hernandez opined S.E.M. was unaware of the cycle of domestic violence and how to break the cycle. Dr. Hernandez recommended that A.S. not be reunified with S.E.M. until she had counseling to understand how to stop engaging in future at-risk relationships and demonstrated the ability to meet A.S.'s basic needs. Dr. Hernandez also recommended S.E.M. get psychiatric treatment for major depression. Dr. Hernandez testified a victim of domestic violence demonstrates the cycle of domestic violence has not been broken when the victim voluntarily visits the perpetrator, and such a visit also raises the question of whether the victim can protect her children and act in their best interest. Dr. Hernandez stated homeless

shelters are designed to be appropriate places for children. Dr. Hernandez testified delays in completing services raise concerns about S.E.M.'s protective capacity.

An investigator with the Department received a referral on August 14, 2015, for neglectful supervision of X.L. S.E.M. was observed with bruises on her body at a motel where she was staying, and there was a concern about domestic violence. The investigator stated he would be surprised if S.E.M. testified she moved to Corpus Christi in July of 2015. When the investigator went to the motel, Llamas was in the room with S.E.M. and X.L. The investigator did not observe any bruising on S.E.M. but advised her about the referral and about the women's shelter. S.E.M. did not want to go to the shelter and said Llamas was just visiting. The investigator believed Llamas was staying with S.E.M. at the motel. S.E.M. told the investigator Llamas had not placed his hands on her since January and did not mention the July 2015 assault. The investigator saw X.L. and stated he was fine. The investigator transferred the case to Corpus Christi because S.E.M. informed him she was moving there the following Monday.

Detective Joseph A. Brown, II was assigned a case in October of 2014 involving an injury to A.S. by Llamas. When Detective Brown interviewed S.E.M., she told him Llamas was her boyfriend. She also told him Llamas would hit her with a belt and kick her in the stomach. She further told him she took the photograph of A.S.'s injuries that was admitted into evidence. Detective Brown did not locate anyone who saw Llamas injure A.S. or witness the incident. Detective Brown received conflicting information regarding whether any children were present, but he did not interview any children. A doctor told Detective Brown the injury could not have been caused by A.S. falling down the stairs or being pushed by another child. Detective Brown forwarded the case to the district attorney's office because he believed Llamas had committed the criminal offense of injury to a child.

Jennifer C., one of the Department's caseworker assistants, transported A.S. to and from visits and monitored the visits between S.E.M. and A.S. since June of 2015. Jennifer observed S.E.M. with Llamas while Jennifer was leaving with A.S. after a visit in San Antonio before S.E.M. moved to Corpus Christi. Before that visit, Jennifer was informed S.E.M. and X.L. would be going to the battered women's shelter when the visit ended, but S.E.M. informed her she had changed her mind. Of the eight visits which S.E.M. could have had with A.S. in Corpus Christi, she only visited with him three times because X.L. was sick or had a doctor's appointment on the dates of the other scheduled visits. Based on information she was provided by a staff member at the shelter where S.E.M. was living in Corpus Christi, Jennifer believed Llamas was also living at the shelter. Since December of 2015, S.E.M. had visited with A.S. about eleven or twelve times and had missed between eighteen and twenty visits. From January 19, 2016 until the beginning of March, S.E.M. did not contact Jennifer to schedule visits, and S.E.M. told her she had not been in contact because she was sick. Jennifer testified A.S. loves his mom and has a bond with her, but Jennifer did not believe it was a strong bond. On some occasions, A.S. did not want to go to the visit, and during some visits, A.S. was playing by himself. On most occasions, A.S. was not emotional about leaving; however, A.S. did cry at the end of some of the visits and had expressed a desire to live with S.E.M. and X.L. Jennifer stated A.S. also calls his foster parent mom, and A.S. is bonded with his foster brother. When S.E.M. pointed out some minor bruises and scratches on A.S., Jennifer reported those injuries to the caseworker. A.S. told S.E.M. the bruises were caused by his foster brother. Jennifer believed the bruises were normal and caused by the two boys roughhousing.

Dr. James L. Lukefahr received a referral on A.S.'s case on September 15, 2014, stating A.S. had a large amount of bruising on the side of his head which was reported to have been the result of a fall on concrete steps. Dr. Lukefahr received a photograph with the referral and was

asked to opine on the likelihood that the bruising was caused by a fall. The photograph was the same photograph admitted into evidence. Based on the photograph, Dr. Lukefahr believed the injuries were not likely to have been caused by a fall. Dr. Lukefahr examined A.S. on September 22, 2014. During his conversation with S.E.M., she informed him she was not present when A.S. was injured, but she believed A.S. fell down the stairs and stated A.S. told her he fell. She also denied any domestic violence in her relationship with Llamas. After the examination, Dr. Lukefahr's opined the bruising was not likely caused by a fall, and he had strong concerns that the bruising was caused by a hand-slap with a substantial amount of force. Dr. Lukefahr noted the bruise covered most of the right side of A.S.'s face, and he also expressed concern that S.E.M. did not seek medical treatment after A.S. fell.

Angie S. was temporarily assigned as the caseworker on A.S.'s case from October of 2015 until the end of December of 2015, while another caseworker was on maternity leave. When she was initially assigned the case, S.E.M. was living in a shelter in Corpus Christi. Angie's primary contact was by phone; however, she had difficulty reaching S.E.M. because the phone numbers would be changed or disconnected. S.E.M. was not engaged in any services at that time, and Angie did not believe S.E.M. was interested in engaging in services. Angie traveled to Corpus Christi on November 10, 2015 to meet with S.E.M. At that meeting, S.E.M. stated she had an appointment with a psychiatrist on November 16, 2015. S.E.M. reported she was not in contact with Llamas. S.E.M. called Angie on December 3, 2015, and informed her she was moving back to San Antonio because she was afraid of Llamas who had threatened to kidnap X.L. and she wanted to be closer to A.S. Angie previously had contacted a worker at the shelter who informed her Llamas also had been staying at the shelter. The case was reassigned to the original caseworker on December 18, 2015. Angie testified domestic violence was her primary concern while working the case because Llamas was the alleged perpetrator of A.S.'s injuries and Llamas was still around S.E.M. and X.L.

In order to show she was rehabilitated, Angie stated S.E.M. would need to complete domestic violence classes and demonstrate the ability to protect herself from Llamas in the future because if S.E.M. was not able to protect herself she would not be able to protect her children.

Vanessa B. was assigned to A.S.'s case in May of 2015 and worked the case to the date of trial except during the period of time she was on maternity leave. Vanessa testified S.E.M. did not complete counseling or domestic violence classes as required by her service plan. Although S.E.M. completed a psychological evaluation, she did not follow the recommendation that she undergo a psychiatric evaluation. S.E.M. was also inconsistent with visiting A.S. and had been unable to demonstrate her parenting abilities with A.S. Vanessa stated S.E.M. had sixty-eight scheduled visits but only made approximately twenty of those visits. S.E.M. did not visit A.S. for six weeks from January of 2016 to the end of February or beginning of March. Although S.E.M. was allowed weekly phone visits after she moved to Corpus Christi, she was inconsistent with the phone calls. Initially, A.S. would get upset when S.E.M. did not call, but was unphased by it at the time of trial. Vanessa testified S.E.M. told her X.L. had a bad diaper rash when Vanessa picked her up to drive her to an appointment in another town. Although Vanessa asked S.E.M. if she needed to check X.L.'s diaper three or four times during the two-and-a-half-hour trip to the other town, S.E.M. only felt the outside of the diaper. She never opened the diaper to check the rash. Vanessa stated she had concerns about S.E.M.'s relationship with Llamas because he has a domestic violence history and criminal history. Vanessa believed S.E.M. was still in a relationship with Llamas because S.E.M. visited him in jail. Vanessa had concerns S.E.M. was involved in another relationship while A.S.'s case was pending because S.E.M. told her she was pregnant in January of 2016; however, she had a miscarriage. Vanessa testified S.E.M. was currently living at a homeless shelter which was an appropriate home; however, based on a conversation Vanessa had with S.E.M.'s sister, Vanessa believed S.E.M. had plans to move to another state. Vanessa

believed terminating S.E.M.'s parental rights was in A.S.'s best interest because S.E.M. had a pattern of domestic violence which she does not comprehend. Vanessa stated A.S. is vulnerable and too young to articulate the cause of his injuries. She also believed S.E.M. would permit Llamas to be around A.S. whenever Llamas was released from jail because S.E.M. stated she cannot keep Llamas away from X.L. Vanessa did not believe A.S. wanted to leave his foster home. Although S.E.M. claimed to be engaged in services for family violence with an independent provider, S.E.M. would not provide the releases necessary for the Department to obtain those records. Based on her conversation with the provider, Vanessa believed S.E.M. was only very minimally engaged in services. Because S.E.M. did not believe A.S. had a speech impediment, Vanessa did not believe S.E.M. would seek treatment for A.S.'s speech impediment if she had custody. Although S.E.M. told Vanessa she intends to return to taking medication for her mental health issues, she had not demonstrated that she will follow through on that intention. S.E.M. had only started therapy in March of 2016 and had attended only three sessions. Vanessa believed S.E.M. loves A.S., and A.S. probably loves S.E.M.

## STANDARD OF REVIEW

To terminate parental rights pursuant to section 161.001 of the Code, the Department has the burden to prove: (1) one of the predicate grounds in subsection 161.001(b)(1); and (2) that termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001 (West Supp. 2016); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The applicable burden of proof is the clear and convincing standard. TEX. FAM. CODE ANN. § 161.206(a) (West 2014); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

In reviewing the legal sufficiency of the evidence to support the termination of parental rights, the court must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. "[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id*. "A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id*.

In reviewing the factual sufficiency of the evidence to support the termination of parental rights, a court "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id*. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*.

### PREDICATE FINDINGS

The trial court found S.E.M.'s parental rights should be terminated because she: (1) knowingly placed or knowingly allowed A.S. to remain in conditions or surroundings which endangered his physical or emotional well-being, § 161.001(b)(1)(D); (2) engaged in conduct or knowingly placed A.S. with a person who engaged in conduct which endangered his physical or emotional well-being, § 161.001(b)(1)(E); and (3) failed to comply with the provisions of a court order that specifically established the actions necessary to obtain the return of A.S. who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of A.S.'s removal for abuse or neglect, § 161.001(b)(1)(O). In her brief, S.E.M. challenges the trial court's first and second findings, but she does not challenge the finding that

she failed to comply with the provisions of a court order establishing the actions necessary to obtain A.S.'s return.

As previously noted, only one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d at 362. "'If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights.'" *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.) (quoting *In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.)). Because S.E.M. does not challenge the trial court's third predicate finding which can support the order of termination, we need not review the sufficiency of the evidence to support the other grounds. *Id*. at 769-70; *In re D.P.R.V.*, No. 04–09–00644–CV, 2010 WL 2102989, at \*1 (Tex. App.—San Antonio May 26, 2010, no pet.) (mem. op.).

## BEST INTEREST

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, when the court considers factors related to the best interest of the child, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2016). In determining whether a child's parent is willing and able to provide the child with a safe environment, the court should consider: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others

who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* at § 263.307(b).

Courts also may apply the non-exhaustive Holley factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). Those factors include: (1) the desires of the child; (2) the present and future emotional and physical needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans held by the individuals seeking custody of the child; (7) the stability of the home of the parent and the individuals seeking custody; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.*

The foregoing factors are not exhaustive, and "[t]he absence of evidence about some of [the factors] would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). "A best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San

Antonio 2013, pet. denied). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*

A.S. was two years old when the Department filed its petition, and three and one-half years old at the time of trial. Because of his young age, A.S. was physically and mentally vulnerable. A.S. expressed a desire to stay with S.E.M. during visits, but told one caseworker while the trial was ongoing that he wanted to stay with his foster family. A.S. is bonded to both S.E.M. and his foster family.

The bruising to A.S.'s face was severe; however, S.E.M. did not take A.S. to a doctor or hospital for medical care because she was afraid the Department would get involved. Llamas, the alleged perpetrator, had a history of domestic violence against S.E.M. Although S.E.M. testified she did not intend to engage in a future relationship with Llamas, the caseworkers believed she would especially given that S.E.M. had visited Llamas in jail and stated she could not keep Llamas from visiting X.L. S.E.M. had not engaged in sufficient counseling to understand she was in a cycle of domestic abuse. Given A.S.'s age, he needed someone with the ability to protect him.

Although S.E.M. was caring for X.L., she admitted to the instance in which she did not change his diaper for over four hours despite telling the caseworker he had severe diaper rash. S.E.M. also refused to engage in the services necessary to learn how to protect herself and her children from future domestic violence. Although S.E.M. had been residing in the same shelter for three months, she had moved several times during the pendency of the case which included several stays at locations for only a few weeks. In addition, S.E.M.'s sister informed the caseworker that S.E.M. plans to move to another state. Although programs were offered to assist S.E.M., her actions demonstrated her lack of interest in engaging in the services offered. Additionally, her failure to attend two-thirds of her scheduled visits also demonstrated a lack of

interest in parenting A.S.  Finally, the evidence established that S.E.M. does not have an adequate support system to assist her in caring for A.S.

A.S. had lived in the same foster home for almost one year and was bonded with his foster family.  The Department's plan was to locate a family to adopt A.S.

Having reviewed the record, we hold the evidence is sufficient to support the trial court's finding that termination was in A.S.'s best interest.

CONCLUSION

The trial court's order is affirmed.

Sandee Bryan Marion, Chief Justice